IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | 8:06CR140 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | REPORT AND |
| | ) | |
| JOHN L. PARKS, | ) | RECOMMENDATION |
| | ) | |
| Defendant. | ) | |

    This matter is before the court on the motion to suppress filed by defendant John L. Parks (Parks) (Filing No. 11). Parks is charged in the Indictment with the possession a .45 caliber pistol after having been convicted of a felony (Count I) in violation of 18 U.S.C. § 922(g), the possession of a stolen .45 caliber pistol (Count II) in violation of 18 U.S.C. § 922(j), the possession of "crack" cocaine (Count III) in violation of 21 U.S.C. § 844(a), the distribution of "crack" cocaine (Count IV) in violation of 21 U.S.C. § 841(a)(1), and a criminal forfeiture of $2,116 in U.S. currency (Count V) in violation of 21 U.S.C. § 853. Parks seeks to suppress evidence obtained by the Omaha Police Department (OPD) on January 4, 2006, during a search of 5122 Northwest Radial Highway in Omaha, Nebraska, from a detention and arrest of Parks, and from a post-arrest interrogation of Parks. An evidentiary hearing was held on Parks's motion on June 5, 2006. During the hearing, the court heard the testimony of OPD Officers Joseph E. Baudler (Officer Baudler) and Scott Beran (Officer Beran), and Rosie L. Parks (Ms. Parks). The court also received into evidence an OPD Permission For Search form (Exhibit 1). A transcript of the hearing (TR.) was filed on June 16, 2006 (Filing No. 21).

**FINDINGS OF FACT**

    On the evening of January 4, 2006, the OPD gang suppression unit was conducting a drug purchase near 48th and Sahler Streets in Omaha, Nebraska (TR. 4). OPD Officers Baudler and Beran were in a police vehicle with emergency equipment and were in a supporting role to the actual purchase of "crack" cocaine by a cooperating individual (CI) (TR. 4-5). When the purchase was made by the CI, OPD Officer James Ball relayed

information to Officers Baudler and Beran, who were nearby, that the transaction took place and the suspect got into a vehicle and was leaving the scene (TR. 4). Officers Baudler and Beran were to stop the vehicle that was leaving the scene and were given a description of the vehicle and the suspect who was dressed in black clothing (TR. 4).

Officers Baudler and Beran saw the vehicle driving out of the parking lot and they began to follow the vehicle (TR. 5). Officers Baudler and Beran activated their emergency lights and stopped the vehicle near 48th Street (TR. 5). As the officers approached the vehicle on foot, the vehicle sped off (TR. 5). The officers noted there were two passengers in the vehicle, a male driver dressed in black and a female passenger (TR. 5-6). The officers returned to their police vehicle and gave chase (TR. 6). The suspect vehicle was traveling at speeds of 70 and 80 miles per hour and running stop signs (TR. 6). The officers lost sight of the vehicle for a few minutes but discovered it abandoned on Northwest Radial Highway (TR. 6). Some citizens standing in the area of the abandoned vehicle told the officers that a black male ran from the area in a northwest direction through some yards (TR. 6). Officer Baudler gave chase on foot while Officer Beran began circling the area in the police cruiser (TR. 6). Officers Baudler and Beran kept in contact with each other by radio (TR. 6). While Officer Baudler was behind an apartment building on Northwest Radial Highway, Officer Beran radioed Officer Baudler that Officer Beran saw a person matching the suspect running into the apartment building (TR. 7). As Officer Baudler was receiving the radio communication, Officer Baudler heard the back window of a third level apartment come flying open and then heard something flying through the trees and crashing on the ground (TR. 7). Since it was dark outside, Officer Baudler did not see what came out of the window (TR. 7). Officer Baudler ran around to the front of the building and met up with Officer Beran and Sergeant Bianchi, who had joined the hunt for the suspect (TR. 7).

The officers ran up the stairs to the suspected apartment and pounded on the door (TR. 8). Moments before the officers were about to breach the door, Officer Baudler heard a female voice on the other side of the door say "Who is it?" (TR. 8; 47). Officer Baudler stated "it's the police" (TR. 9). The door is opened by Rosie Parks (TR. 9). Officer Baudler testified that he asked Ms. Parks who just ran into the apartment (TR. 9). Officer Baudler

did not recall Ms. Parks exact words, but he testified that by her words and gestures she gave permission to come into the apartment and look (TR. 10). Officer Beran recalled Officer Baudler having a few words with Ms. Parks before the officers went into the apartment with guns drawn to secure the residence (TR. 47-48). Officer Beran recalled the officers entering the apartment on a "slow clear" rather than an onrush since it was clear that the occupants were aware that police officers were outside (TR. 48-49). Once inside the apartment, the officers located, apart from Ms. Parks, a young female in the living room, Anthony Parks in the back bedroom, a person in the hallway, another person in a back bedroom, and the defendant Parks in the bathroom (TR. 11). Parks was standing by the toilet (TR. 11). Parks was not using the toilet but there was a bag of suspected "crack" cocaine floating in the toilet water (TR. 11). Parks was arrested (TR. 12).

When all the parties were secured by the officers, Officer Baudler talked with Ms. Parks, explained to her what was happening, and presented her with an OPD Permission to Search form (TR. 12). Officer Baudler explained the form to Ms. Parks and she signed the form giving permission to search the apartment (TR. 14; 17-19; Exhibit 1). The officers searched the apartment and found $6,000 in a storage bin in the back bedroom, some drug paraphernalia in another bedroom, $2,000 on Parks' person along with a bag of suspected "crack" cocaine in his pocket (TR. 15). The officers also observed a .44 magnum revolver and a .45 caliber pistol lying on the ground outside the back bedroom window that appeared to be forced open (TR. 15). Ms. Parks was interviewed by Officer Baudler (TR. 19). Ms. Parks told Officer Baudler that Parks was her nephew who would come over and visit her from time to time but Parks did not live in the apartment (TR. 20). Ms. Parks said the drug paraphernalia found was hers but the other items found were not hers and she did not know anything about them (TR. 20). Ms. Parks told Officer Baudler that she knew something was amiss when people ran into her apartment followed shortly by the police (TR. 21).

Parks was interviewed and he told Officer Baudler he was outside when a guy dressed in black came running into the courtyard area of the apartment complex followed shortly by the police (TR. 22). Parks said he did not want to be mistaken for the running

3

suspect, so he ran into his aunt's apartment (TR. 23).  Parks denied knowledge of the guns and "crack" cocaine (TR. 23).  Parks stated he did not live at the apartment but stayed there from time to time (TR. 23).  Parks stated he resided mainly by floating from one girl friend's place to another (TR. 23).  Parks did not have keys to the apartment but had to have his aunt let him in when he came to visit (TR. 24).  It was subsequently determined that Parks was not the person who made the sale to the CI and another person using the name of Carlos was subsequently arrested for that transaction (TR. 26).

## LEGAL ANALYSIS
### 1.  Standing

To claim Fourth Amendment protection, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable.  ***Minnesota v. Carter***, 525 U.S. 83, 88 (1998); ***United States v. Boyster***, 436 F.3d 986, 992 (8th Cir. 2006).  The reasonableness of the expectation of privacy must have "a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society."  ***Rakas v. Illinois***, 439 U.S. 128, 143-44 n.12 (1978); **see also** ***Smith v. Maryland***, 442 U.S. 735, 740-41 (1979).  "If a defendant fails to prove a sufficiently close connection to the relevant places or objects searched he has no standing to claim that they were searched or seized illegally."  ***United States v. Barragan***, 379 F.3d 524, 529-30 (8th Cir. 2004) (**quoting *United States v. Gomez***, 16 F.3d 254, 256 (8th Cir. 1994)).

The Eighth Circuit has recognized that:

> The Supreme Court has enunciated a two part test to determine whether a person has a legitimate expectation of privacy in the place searched or the object seized.  A court must determine:  (1) whether the petitioner has asserted a subjective expectation of privacy, and (2) whether the petitioner's subjective expectation is objectively reasonable.

***United States v. Stallings***, 28 F.3d 58, 60 (8th Cir. 1994) (internal citations omitted).  "Fourth Amendment rights are personal rights that may not be asserted vicariously."  ***Barragan***, 379 F.3d at 529.  Therefore, the court "must first determine whether [the

defendant] had a legitimate expectation of privacy in the area searched or the item seized." *Gomez*, 16 F.3d at 256. The Eighth Circuit has explained:

> Factors relevant to the determination of standing include: ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case.

*Id.*

Parks has not established he has standing to object to the search of Rosie Parks' apartment. He was an occasional visitor to the apartment but did not live there. On the night in issue, he ran into the apartment from outside to escape police pursing a suspect and did not want to be caught up in the pursuit. While Parks may have stayed at the apartment with Ms. Parks' permission on occasion, Parks' presence on the premises on the evening of January 4, 2006, was merely that of a visitor. Parks does not have standing under the Fourth Amendment to challenge the search of the apartment at 5122 Northwest Radial Highway in Omaha, Nebraska, on January 4, 2006.

### 2. Consent by Ms. Parks

Assuming, *arguendo*, Parks had standing in the apartment, Ms. Parks gave the police her consent to search the apartment. The Fourth Amendment test for a valid consent to search is that the consent be voluntary, and such "[v]oluntariness is a question of fact to be determined from all the circumstances." *Ohio v. Robinette,* 519 U.S. 33, 40 (1996). Some personal characteristics that aid in determining voluntariness of consent are age, intelligence, whether an individual was under the influence of drugs or alcohol, whether an individual was read his *Miranda* rights, and whether an individual had experienced prior arrests. *United States v. Welerford*, 356 F.3d 932, 936 (8th Cir. 2004). A court may also look at environmental factors including, the period of time that the individual was detained; whether the police threatened, physically intimidated, or punished the individual; whether promises or misrepresentations were made upon which the individual relied; whether the individual was in custody or under arrest at the time of

consent; whether the consent occurred in a public or secluded place; and whether the individual objected or stood by silently while the search occurred. *Id.*; *United States v. Contreras*, 372 F.3d 974, 977 (8th Cir. 2004). "The government bears the burden of proving voluntary consent [to search] by a preponderance of evidence." *United States v. Galvan-Muro*, 141 F.3d 904, 907 (8th Cir. 1998).

In addition to voluntariness, consent must be obtained from "the defendant or 'from a third party who possesse[s] common authority over or other sufficient relationship to the premises or effects sought to be inspected.'" *United States v. Adams*, 346 F.3d 1165, 1170-71 (8th Cir. 2003) (**quoting** *United States v. Matlock*, 415 U.S. 164, 171 (1974)). "The relevant inquiry is whether the facts available would have justified a reasonable officer in the belief that the consenting party had authority over the [property]." *Id.* Further, consent may be reasonably implied from behavior, rather than solely verbal affirmance. *United States v. Williams*, 346 F.3d 796, 799 (8th Cir. 2003) (consent to entry found where individual opened door wide and stepped aside); **see also** *United States v. Mendoza-Cepeda*, 250 F.3d 626, 627-29 (8th Cir. 2001) (finding law enforcement reasonably viewed the defendant's gestures as consent to a search); *United States v. Jones*, 254 F.3d 692, 695 (8th Cir. 2001) (consent to search person found where defendant opened and raised his arms with palms up).

In the present case, no evidence suggests Ms. Parks was threatened, intimidated, or promised anything in return for giving her consent to search the apartment. In fact, she encouraged the officers to conduct a search. Ms. Parks also signed a permission to search after having her rights explained to her by Officer Baudler. Since Ms. Parks was the principal tenant of the apartment, her consent to search permitted the officers to search the entire apartment. Even assuming, *arguendo*, Parks had some standing in the apartment, *Georgia v. Randolph*, 547 U.S. ___ , 126 S. Ct. 1515 (2006), does not apply as Parks, although present at the time of the search, did not object to the search.

### 3. Abandoned Firearms

The firearms found outside of the apartment which were tossed out of the window onto the ground are deemed abandoned property. First, Parks has not asserted any

standing in the grounds outside the apartment nor in the firearms themselves.  Second, Parks can have no reasonable expectation of privacy in such discarded items.  See *United States v. Segars*, 31 F.3d 655 (8th Cir. 1994).  Accordingly, Parks has no basis to object to the police seizure of the firearms tossed from the window onto the ground.

### 4. Parks' Statements

Parks does not contest the voluntariness of his statements to Officer Baudler.  He concedes he was advised of his *Miranda* rights and only seeks to suppress such statements as the fruit of an illegal entry into the apartment and his arrest.  Since the court has found the entry into the apartment to be lawful, Parks' arrest after being discovered attempting to flush a bag of "crack" cocaine down a toilet was supported by probable cause.  Parks' arrest was justified by probable cause and the subsequent body search of Parks was justified as incident to his arrest.  Accordingly, there being no poison tree, Parks' subsequent statements are admissible against him.

**IT IS RECOMMENDED TO JUDGE LAURIE SMITH CAMP that:**
Parks's motion to suppress (Filing No. 11) be denied.

### ADMONITION

Pursuant to NECrimR 57.3 any objection to this Report and Recommendation shall be filed with the Clerk of the Court within ten (10) days after being served with a copy of this Report and Recommendation.  Failure to timely object may constitute a waiver of any objection.  The brief in support of any objection shall be filed at the time of filing such objection.  Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 3rd day of August, 2006.

BY THE COURT:
 s/ Thomas D. Thalken
 United States Magistrate Judge